**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

BRANDY JEAN MAYFIELD,      )
            )
      Plaintiff,      )
            )
v.             )     Case No. 4:14-CV-00740-NKL
            )
CAROLYN W. COLVIN,      )
Acting Commissioner      )
of Social Security,      )
            )
      Defendant.      )

## ORDER

Before the Court is Plaintiff Brandy Mayfield's appeal of the Commissioner of Social Security's final decision denying her application for supplemental security income under Title XVI of the Social Security Act. [Doc. 9]. For the following reasons, the Commissioner's decision is affirmed.

## I.    Background

Mayfield was born in 1979 and has a ninth grade education. She alleges she became disabled on November 11, 2006. When she filed for benefits in September 2010, she alleged disability from the combined effects of a head injury, anxiety, memory, and impulsivity. [Tr. 165]. At Mayfield's hearings before an administrative law judge (ALJ) in March and October 2012, Mayfield also alleged that she suffered from panic attacks, back pain, migraines, muscle pain, and fibromyalgia. She stated that her concentration, memory, and anxiety were what bothered her the most. [Tr. 65].

### A.  Medical History and Related Testimony from Mayfield

1

Because Mayfield does not challenge the ALJ's conclusions regarding how her anxiety, panic attacks, or memory impairments affect her ability to work, the Court will focus on the medical history related to Mayfield's headaches/migraines, back pain, and fibromyalgia.

**1. Headaches and Migraines**

In January, March, and June 2006, Mayfield attended consultations for migraines. [Tr. 399-401]. In January 2006, her migraines were described as stable and in March and June 2006, Mayfield was described as "doing well" or "doing pretty good." *Id.* In April 2006, Mayfield went to the emergency room and received a pain relief injection for headaches. [Tr. 404].

Mayfield was in a car accident in November 2006. She complained of a headache, and a CT scan revealed swelling in the back of her scalp, but not acute intracranial hematoma. [Tr. 334]. A CT scan in mid-November revealed a left frontal subcutaneous hematoma. [Tr. 487]. In early December 2006, Mayfield complained of headaches, and in late December 2006, Mayfield stated that her headaches had improved. [Tr. 362-63].

In January 2007, Mayfield presented for a neurology consultation. She complained of headaches, but stated they had improved "a bit." [Tr. 379]. She stated that she sees halos around lights. *Id.* The specialist opined that Mayfield likely suffered from a concussion during the car accident. He recommended psychiatric treatment, non-steroidal anti-inflammatories, stretching, and exercise. [Tr. 381]. Also in January 2007, Mayfield went to the emergency room complaining of a headache. [Tr. 385]. The physician observed that Mayfield was mildly distressed, but a CT scan was negative. *Id*. In March 2007, Mayfield received a pain relief injection for her headache. [Tr. 408].

Almost three years later, in January 2010, Mayfield was transported via ambulance to the emergency room after seeing an aura of green light and experiencing light headedness. [Tr. 294].

2

At the hospital, Mayfield stated that the symptoms – which were moderate – had resolved. *Id.* The physician observed that Mayfield experienced blurred vision and photophobia, but no headaches before, during, of after the aural episode. *Id.* The physician's assessment stated: "aura resolved; hepatitis B & C; severe nicotine addiction." [Tr. 296]. She was discharged with a recommendation to stop smoking, increase fluid intake, and take her Xanax as prescribed. *Id.* Ten months later, in October 2010, Mayfield went to the emergency room complaining of a headache lasting for three days. [Tr. 258]. However, Mayfield explained that the headache started after exposure to carbon monoxide. [Tr. 259]. The physician assessed acute gastroenteritis, dehydration, and headache. [Tr. 267].

At her first hearing in March 2012, Mayfield stated that she quit a part-time job she held in February 2012 cleaning at a courthouse because she started to experience vision loss and migraines and because she was stressed around people. [Tr. 60]. She stated that she has had migraines "for years" and experiences tunnel vision and light sensitivity. *Id.* She had not had a migraine since the previous month. When she has a migraine, she lies down and takes Tylenol. The migraines do not last long. *Id.*

### 2. Back Pain

After her car accident in November 2006, Mayfield complained of back pain. [Tr. 333]. A CT of the cervical spine showed no acute fracture. [Tr. 335]. In January 2007, Mayfield complained of back pain. In June 2008, Mayfield denied back pain and had normal spinal range of motion. [Tr. 432]. In August 2008 and February 2009, Mayfield complained of moderate, nonradiating back pain that was aggravated by bending and alleviated by a warm bath. [Tr. 434-41]. The physician assessed back pain and muscle spasms and prescribed a muscle relaxant as needed. *Id.* Mayfield complained in September 2009, and her physician recommended "good

3

biomechanics" and exercise. [Tr. 221]. In December 2009 and March 2010, Mayfield complained of back pain. Examinations revealed bilateral thoracic and lumbar tenderness and muscle spasms. The physicians assessed chronic back pain and lumbar strain. [Tr. 287, 299-300, 569]. In March 2011, a lumbar x-ray was negative, but there was limited range of motion bilaterally, tenderness, lumbar and paraspinous muscle spasms after Mayfield fell in the shower. [Tr. 543-44]. Mayfield also complained in February and December 2012. [Tr. 594, 644].

At her hearing in March 2012, Mayfield testified that her back hurt when she worked once a week cleaning. [Tr. 59]. She testified that she had "really bad muscle pain for a long time" but that since she has been relaxing and taking care of herself, the pain is "a lot better." [Tr. 63]. Her back hurts "sometimes real bad." *Id.* She alleviates pain by taking a bath.

### 3. Fibromyalgia

In February 2012, Mayfield complained of anxiety. The "History of Present Illness" section states in part that "[t]he anxiety is associated with chronic pain (fibromyalgia)." [Tr. 619]. Mayfield rated her chronic pain at a 2. Fibromyalgia is not listed as a chronic problem in that record. *Id.* When the physician refused to write Mayfield a prescription for narcotic medication, citing previous infractions and prescription drug abuse, Mayfield became upset and "left the room hurriedly . . . before an exam could be performed." [Tr. 621]. In September 2012, Mayfield complained of fibromyalgia, the symptoms of which began four years earlier, and requested medication. [Tr. 625]. Mayfield complained of muscle weakness and joint pain, [Tr. 626], but an examination revealed normal range of motion, muscle strength, and stability in all extremities with no pain on inspection, [Tr. 628]. Mayfield's physician assessed fatigue, fibromyalgia, and generalized anxiety disorder but commented that Mayfield requested medication "for her chronic pain which she was given the [diagnosis] of 'fibromyalgia' by

4

another practitioner who previously had her on narcotics . . . ." [Tr. 628]. In October 2012, Mayfield requested medication for generalized body pain. [Tr. 634]. An examination revealed no back, neck or joint pain, no joint swelling, and no muscle weakness. [Tr. 636]. Her physician assessed fibromyalgia and wrote that he "discussed at length with patient why I will not prescribe her Vicodin for her pain." *Id.* Mayfield was tearful and insisted that she needed pain medication. *Id.* She was referred to a pain management clinic. A "Continuity of Care Record" created in December 2012, which documents Mayfield's diagnoses, lists fibromyalgia. [Tr. 611].

In March 2012, Mayfield testified that her muscle pain was "a lot better" and is alleviated by taking a bath. [Tr. 63]. She stated that one doctor diagnosed her with fibromyalgia while another doctor denied the diagnosis and attributed her muscle pain to depression. [Tr. 64]. At her hearing in October 2012, Mayfield stated that she had fibromyalgia and had to quit a job cleaning once a week because of muscle pain and the loss of her vehicle. [Tr. 42]. At her previous hearing in March 2012, Mayfield stated that her back hurt at the once-a-week cleaning job, but she stated she quit that job to work at the courthouse cleaning job instead. [Tr. 59].

## B. ALJ's Decision

After a hearing in March 2012 and a supplemental hearing in October 2012, the ALJ concluded that Mayfield suffered from the following severe impairments: post-traumatic stress disorder and major depressive disorder. [Tr. 16]. Mayfield had the following non-severe impairments: chronic hepatitis C, headaches, back pain, and a history of illicit drug use. [Tr. 17]. The ALJ determined that no evidence supported a medically determinable impairment of fibromyalgia. [Tr. 18]. The ALJ determined that Mayfield had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with certain non-exertional limitations. [Tr. 21]. Mayfield is able to make good decisions during everyday situations and or

5

stressors, but not consistently. She can understand and remember simple or moderately complex instructions during a normal workday. She can interact with co-workers, supervisors and the general public occasionally, but would work best with "things" rather than people. *Id.*

In making her conclusion, the ALJ relied on Mayfield's sporadic work history, fairly normal activities of daily living, and inconsistent testimony, the objective medical findings, and the opinions of examining and non-examining psychologists. The ALJ stated that there were inconsistencies in Mayfield's testimony and the record for why she left two part-time jobs during her alleged disability period. [Tr. 28]. Mayfield also testified that she quit her part-time jobs because she was in pain and was anxious around people, but stated in other portions of the record that she could mow a lawn, clean her own house, cook meals daily, drive, grocery shop, attend church and prayer meetings, take care of herself, and take care of four out of five of her children on a daily basis. Mayfield also occasionally babysat other children. [Tr. 17-18, 28].

At Mayfield's second hearing, a vocational expert (VE) testified that a person with the same age, education, work history, and RFC as Mayfield could perform jobs that exist in the local and national economies, including as a kitchen helper, linen-room attendant, and order filler. [Tr. 45-46]. The VE testified that he would reduce the overall job base due to social avoidance issues and to account for factors such as variety and stress related to Mayfield's inability to always make good decisions. [Tr. 45-47].[1] Based on this testimony and acknowledging that the job base would be decreased by 20 percent, the ALJ concluded that Mayfield was capable of working jobs that existed in significant numbers in the national economy and was therefore, not disabled. [Tr. 31].

## II.     Discussion

---

[1] A more detailed description of the VE's job base reduction testimony is in Part II.C.2.

Mayfield argues the Commissioner's decision is not supported by substantial evidence in the record as a whole because the ALJ did not find that Mayfield's fibromyalgia was a medically determinable impairment, because the ALJ's RFC determination was not supported by substantial evidence, and because the Commissioner failed to sustain her burden at Step 5 of the evaluation process.

## A. Determination that Fibromyalgia was not a Medically Determinable Impairment

At Step 2 of the evaluation process, the ALJ stated that "there is no evidence supporting a medically determinable impairment of fibromyalgia." [Tr. 18]. Social Security Ruling 12-2P provides guidance on how to evaluate fibromyalgia. SSR 12-2P (2012). A claimant has a medically determinable impairment of fibromyalgia if (1) a physician diagnoses fibromyalgia and (2) provides evidence described in Section II.A or II.B of SSR 12-2P. *Id.* at *2. Section II.A states that a person has a medically determinable impairment of fibromyalgia if she has (1) a history of widespread pain in all quadrants of the body (left, right, above, and below); (2) at least 11 positive tender points on physical examination; and (3) evidence that other disorders that could cause the symptoms or signs were excluded such as laboratory testing and imaging. *Id.* at *2-3. Section II.B requires that a person have (1) a history of widespread pain (like Section II.A); (2) repeated manifestations of six or more fibromyalgia symptoms, especially manifestations of fatigue, cognitive and memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations were excluded. *Id.* at *3.

Mayfield argues that contrary to the ALJ's decision, there are multiple diagnoses of fibromyalgia by multiple physicians and that Mayfield exhibited multiple symptoms of fibromyalgia including widespread pain, anxiety, depression, headache, muscle pain, wheezing,

loss of appetite, memory impairment, and insomnia. The ALJ, after discussing SSR 12-2P, stated that while Mayfield complained of back pain, there was no diagnostic evidence supporting her back pain. The ALJ also stated that Mayfield displayed normal functioning in all extremities without sensory, reflex, motor, or neurological deficits and had normal motor function, no sensory deficits, and stability in all extremities. [Tr. 19].

While the ALJ did not explicitly state that "there was no evidence of widespread pain," – the first requirement in either Section II.A or II.B of SSR 12-2P, it is clear from the ALJ's discussion that this is the reason she did not find a medically determinable impairment of fibromyalgia. The ALJ acknowledged Mayfield's complaints of back pain but, referencing an earlier discussion on back pain, stated that no diagnostic evidence supported back pain. [Tr. 17-18]. The ALJ also remarked that Mayfield had normal functioning in all extremities. This reasoning is supported by substantial evidence in the record as a whole. From 2006 to 2012, Mayfield complained of back pain nine times, with some complaints more than a year apart. Her back pain was described as moderate and sometimes burning and was alleviated by warm baths. CT scans and x-rays were unremarkable. Mayfield had spasms and occasional limited range of motion, but regularly had normal range of motion, no joint or limb tenderness or pain, and normal motor strength, function, reflexes, and sensation. [Tr. 221, 288, 432, 436, 440-41, 595, 628, 631, 636, 640]. Further, Mayfield has a history of back pain, but this alone is insufficient to meet the requirement in II.A or II.B of "widespread pain" because it is not pain in all quadrants of the body. As the ALJ pointed out, musculoskeletal findings in all extremities were normal. In one of the few records mentioning an assessment of fibromyalgia, in October 2012 – nearly six years after Mayfield's alleged onset date – Mayfield requested medication for "generalized body pain," but then denied back pain, joint pain, joint swelling, muscle weakness, and neck pain. [Tr.

635-36]. A physical examination was normal. [Tr. 636]. While it is true that the signs and symptoms of fibromyalgia vary in severity over time and can be absent on some occasions, SSR 12-2P at *5, the six years of records available to the ALJ and the Court do not even support a longitudinal finding of a medically determinable impairment of fibromyalgia.

Mayfield also alleges that the ALJ improperly relied on the lack of medical signs and laboratory findings supporting a fibromyalgia diagnosis because there are no diagnostic tests available to confirm fibromyalgia. However, the ALJ did not conclude that there was no medically determinable impairment of fibromyalgia because there was no diagnostic test confirming it. The ALJ stated that there were no "laboratory or clinical findings or medical observations validating *symptoms* . . . ." [Tr. 19] (emphasis added). Even if there are no tests to confirm the existence of fibromyalgia, there must still be medically documented symptoms of the condition. *See generally* SSR 12-2P.

Further, even if the ALJ had determined there was a medically determinable impairment of fibromyalgia, Mayfield fails to explain how that finding would have affected the ALJ's decision. Mayfield states that the ALJ's failure to find a medically determinable impairment of fibromyalgia affected the ALJ's assessment of Mayfield's severe and non-severe impairments, her credibility, and her RFC, but does not explain how. In other words, even if there was a medically determinable impairment of fibromyalgia, there is no evidence in the record to support a finding that Mayfield's fibromyalgia alone or in combination would have limited her functional abilities in a way that precludes her from working. As described by the ALJ, Mayfield was able to care for herself and her four children, clean her home, mow her yard, drive her children to school, go to the grocery store multiple times a week, play computer games and interact on social media, attend church services and prayer meetings, cook, and babysit other children. In her

Adult Function Report, filled out in November 2010, Mayfield did not list back pain or generalized pain. She stated she had difficulty bending and reaching, but explained that she injured her tailbone "a very long time ago." [Tr. 179]. She had no difficulty lifting, squatting, standing, walking, kneeling, or climbing stairs. *Id.* In a Disability Report – Adult form, Mayfield did not list back pain or pain. She listed "head injury, anxiety, memory, impulsive" in response to a question asking her to list all physical and mental conditions limiting her ability to work. [Tr. 165]. The first time fibromyalgia was diagnosed was February 2012, more than five years after Mayfield's alleged disability onset date, and there are no notes explaining that conclusion or documenting any symptoms. Substantial evidence in the record as a whole supports the ALJ's conclusion that Mayfield did not have a medically determinable impairment of fibromyalgia.

## B. RFC Determination

Mayfield next contends that the ALJ's RFC determination is not supported by substantial evidence in the record as a whole because the ALJ failed to incorporate the effects of her non-severe headaches/migraines and back pain impairments in the RFC, failed to develop the record as to Mayfield's physical impairments, and failed to discuss a third-party statement from a Social Security Administration employee.

### 1. Failure to Include Effects of Headaches and Back Pain in the RFC

Mayfield argues that the ALJ failed to include the effects of her non-severe headaches/migraines and back pain impairments in the RFC. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8P (1996). Before determining Mayfield's RFC, the ALJ acknowledged in her opinion that Mayfield complained of back pain and migraines and stated that she considered all symptoms to the extent they were consistent with medical evidence and

other evidence in the record. The ALJ included a detailed examination and discussion of the medical records and testimony.

Mayfield contends that the ALJ should have included a restriction in the RFC limiting her ability to sustain full-time employment because she "has had to seek emergency room treatment in the form of injections for relief of her headaches and back pain" which would require her to miss work. [Doc. 15, p. 3]. However, substantial evidence in the record as a whole supports the ALJ's decision to impose no such limitation. As to Mayfield's back pain, and as discussed above in Part II.A, the ALJ relied on the objective medical records which largely revealed normal findings related to Mayfield's back. [Tr. 17]; [Tr. 221, 288, 432, 436, 440-41, 595, 628, 631, 636, 640]. The ALJ also relied on Mayfield's Adult Function Report, where she stated she had no difficulty with personal care, completing household chores, mowing the lawn, driving to the store, or grocery shopping for at least thirty minutes at a time. [Tr. 18]; [Tr. 179]. Mayfield is also the primary caretaker of four children, who, in 2007, were approximately 5, 4, 2, and 1 year old. [Tr. 64, 380]. The ALJ also stated that Mayfield did not list difficulty secondary to back pain in her Adult Function Report and testified that her pain had improved and was alleviated by baths, walking, and relaxation. [Tr. 18]; [Tr. 63, 179].

In support of her argument that Mayfield's back pain required an RFC restriction limiting her ability to sustain full-time employment, Mayfield points to three times that she went to the emergency room as substantial evidence that she could not work on a consistent basis. However, these three occasions were in December 2009, March 2010, and March 2011. [Tr. 287, 299, 545]. Given the time between each hospital visit and the fact that the first record cited by Mayfield is more than three years after her alleged onset date, the Court cannot say this evidence is substantial evidence of Mayfield's inability to consistently work.

11

As to Mayfield's headaches and migraines, the ALJ remarked that Mayfield had relatively few migraines and at the time of her hearing, had not had a migraine since she quit her last job.  Mayfield also testified that her migraines did not last very long. [Tr. 60].  The ALJ also observed that Mayfield does not take medication for her headaches.  Mayfield asserts that substantial evidence supports an RFC restricting limiting her ability to work full time because she went to the emergency room for pain relief injections on three separate occasions. However, like the back injections, these visits were spaced apart – April 2006, January 2007, and March 2007 – and on only three occasions in a six year time frame. [Tr. 385-86, 404, 408].  They also all occurred prior to Mayfield's alleged onset date in November 2007.

Mayfield cites to *Pryor v. Astrue*, where this Court remanded the Commissioner's decision in that case, because, among other reasons, the ALJ failed to consider how a non-severe impairment affected the claimant's RFC.  *See Pryor*, 2012 WL 3016722, at * 5 (W.D. Mo. 2012).  However, in *Pryor*, this Court specifically stated that the Commissioner failed to contest the error and has failed to show that the error was harmless.  *Id.*  In this case, however, the Commissioner contests that an error occurred by pointing out that the ALJ specifically discussed Mayfield's headaches/migraines and back pain and arguing that the ALJ's decision not to include further limitations was supported by unremarkable objective medical findings and Mayfield's activities of daily living. Therefore *Pryor* is distinguishable.

Substantial evidence in the record supports the ALJ's decision not to include a full-time work restriction in the RFC due to Mayfield's headaches/migraines or back pain. The ALJ's decision clearly demonstrates that the ALJ considered her headaches/migraines and back pain when making her RFC determination and ultimate disability determination.

### 2.  Failure to Develop the Record as to Physical Limitations

Mayfield further contends that the ALJ's RFC is not supported by substantial evidence because there are no medical opinions in the record related to the severity of Mayfield's physical impairments or their impact on her ability to work. Mayfield argues that the ALJ had a duty to develop the record by ordering a consultative examination.

Initially, the Court notes that Mayfield does not challenge the ALJ's finding that Mayfield's physical impairments were non-severe, so it appears she contests the ALJ's failure to order a medical opinion related to how these non-severe impairments affect her ability to work. A claimant's RFC is a medical question, and an ALJ's RFC assessment must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001), and *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)) (internal citations omitted). The regulations state that treating physicians will be recontacted by the Commissioner when the medical evidence received from them is inadequate to determine a claimant's disability. *Id.* Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Id.* Moreover, a medical record need not explicitly reference whether a claimant's medically evaluated limitations preclude her from working so long as the evaluations describe the claimant's functional limitations with "sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." *Id.* at 620, n. 6 (rejecting a claimant's argument that the ALJ established her RFC in the absence of any medical opinion directly addressing how her mental impairments affected her ability to work where ALJ relied on treatment notes from claimant's doctor citing improvement, diagnosing only mild depressive disorder, and observing that claimant was capable of superficial social contact).

13

Upon review of the entire record, the Court finds that despite no medical opinion explicitly addressing how Mayfield's back pain and headaches/migraines directly affect her ability to work, the ALJ's RFC determination with respect to her non-severe physical impairments was supported by "some medical evidence of [her] ability to function in the workplace." The ALJ concluded that Mayfield could perform a full range of work at all exertional levels. [Tr. 21]. As to her back pain, the ALJ discussed multiple medical records by multiple treatment providers that listed normal, unremarkable findings related to Mayfield's complaints of back pain. [Tr. 17-19, 23-25]. CT scans and x-rays were largely unremarkable, with only occasional instances of muscle spasms. [Tr. 335, 543-44]. Mayfield regularly had normal range of motion, no joint or limb tenderness or pain, and normal motor strength, function, reflexes, and sensation. [Tr. 221, 288, 432, 436, 440-41, 595, 628, 631, 636, 640]. On multiple occasions, Mayfield described her back pain as moderate. [Tr. 434-41]. The ALJ also observed that the most recent treatment record showed no indication of any particular physical problem, the review of systems was normal, and Mayfield was negative for any back, neck, or joint pain and negative for any swelling or muscle weakness. [Tr. 25].

Likewise, the ALJ's RFC determination with respect to her headaches/migraines is also supported by "some medical evidence of her ability to function in the workplace." A neurologist in 2007 opined that Mayfield was likely suffering from post-concussive syndrome, but recommended psychiatric treatment, non-steroidal anti-inflammatories, stretching, and exercise. Mayfield did not seek treatment for headaches from March 2007 to October 2010, and the October headache was after exposure to carbon monoxide. [Tr. 259]. In light of the largely unremarkable, infrequent findings in the medical records cited by the ALJ, the Court concludes

14

that the records were of "sufficient generalized clarity" to allow for an understanding that Mayfield would not be limited by her headaches/migraines and back pain in a work environment.

Further, the ALJ relied on more than just the medical evidence to determine functional limitations related to Mayfield's physical impairments. In particular, the ALJ observed that Mayfield reported no difficulty lifting, standing, or walking, and reported no difficulty with activities of daily living, described above. She also alleviated pain on most occasions with conservative treatment. The ALJ also discussed inconsistencies in Mayfield's testimony regarding why she quit part-time jobs she held during her alleged disability period, which led the ALJ to conclude that Mayfield was not entirely credible.

In her reply, Mayfield cites to several cases where courts in this district – including this Court – have remanded a decision so that an ALJ may develop the record by obtaining an opinion from a claimant's treating physician or another consultant. However, unlike many of those cases, this is not a case where multiple records reveal abnormal findings suggestive of a limited ability to work due to physical impairments and where the ALJ ignored or interpreted those records without the help of a medical opinion. *See i.e.*, *Arn v. Astrue*, 2011 WL 3876418 (W.D. Mo. 2011) (finding that the ALJ did not address certain medical findings related to COPD, did not discuss tests in the record, including x-rays and an MRI, showing multilevel degenerative disc disease, diffuse osteopenia, and severe disc space narrowing, and did not discuss treating physician's opinion that back pain was significant enough to interfere with activities of daily living); *Brown v. Colvin*, 2014 WL 6750041 (W.D. Mo. 2014) (concluding that remand was necessary where medical records consistently documented diagnoses of IBS and multiple reconstructive surgeries, where the claimant testified that his treating physician imposed weight restrictions, and where the ALJ relied only on a non-examining physician's opinion rather

15

than seeking an opinion from the treating physicians); *Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001) (observing that the claimant's treating psychiatrist and an examining psychologist opined that claimant's ability to perform significant work-related functions was limited or nonexistent, and concluding that even if the ALJ provided good reasons for not adopting these opinions, there was no other medical evidence supporting the ALJ's conclusion that his mental impairments limited only his ability to interact with the public). Nor is this a case where the medical records available to the ALJ are insufficient to indicate Mayfield's ability to function in the workplace. *See Reiter v. Colvin*, 2013 WL 2807791 (W.D. Mo. 2013). Rather, the records in this case reveal fairly unremarkable, infrequent findings that are also consistent with Mayfield's own description of her activities and abilities. The medical records, which indicated normal examinations and conservative treatment, support the ALJ's conclusion that her migraines/headache and back pain did not limit her exertional level or any portion of her RFC. Therefore, remand is not required on this point.

### 3. Failure to Consider Third-Party Statement

Mayfield also argues that the ALJ's decision must be reversed and remanded because she did not mention the third-party statement of a Social Security Administration employee. "In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including . . . statements and other information provided by . . . other persons about the symptoms and how they affect the individual . . . ." SSR 96-7P, 1996 WL 374186 (S.S.A. 1996). However, the Eighth Circuit has held that even when an ALJ does not acknowledge or discuss lay opinions in his decision, remand is not required when the same evidence used to discredit the claimant's statements can be used to discredit the layperson's statements. *See Buckner v. Astrue*, 646 F.3d 549, 559-60 (8th Cir. 2011).

16

Mayfield asserts the ALJ was required to consider and discuss the third-party statement of the employee and that the employee's statement verified that Mayfield had difficulty concentrating. The third-party statement at issue is a three page Disability Report filled out by a field office worker. [Tr. 161-63]. The report was the result of a telephone interview with Mayfield and largely consists of the worker's "Yes" or "No" answers to questions. Next to a question asking whether Mayfield had difficulty concentrating, the employee stated "Yes." [Tr. 162]. In the "Observations" section, the employee explained that the reason for stating "Yes" was because "NH has had very brief and irregular jobs. Claimed unable to recall where or how long she worked. See deqy, not insured." *Id.*

While the ALJ did not mention this third-party report, remand is not required. This "third-party report" offers very little evidence related to Mayfield's ability to concentrate. There is no description as to the extent of her ability to concentrate or an explanation as to why Mayfield's inability to remember her work history is an indication of an inability to concentrate. There is no description of her symptoms or how they affect Mayfield. *See* SSR 96-7P. Further, the same evidence used by the ALJ to discredit Mayfield's own concentration-related allegations – which Mayfield does not contest – can be used to discredit the worker's testimony. In her decision, the ALJ concluded that Mayfield had mild difficulties in concentration, persistence, and pace. [Tr. 20]. While she reported difficulty concentrating in her Adult Function Report, she also stated that she is able to pay attention to things she enjoys for a "long period, 2 hours probably." [Tr. 20]; [Tr. 179]. She is also able to keep her home organized, play computer games, and visit social network sites for at least thirty minutes at a time. [Tr. 62-63]. The ALJ also noted that Mayfield was given a WMS-IV examination and that the results revealed that Mayfield was able to concentrate for short periods. [Tr. 26]. The ALJ ultimately adopted a

concentration-related limitation in the RFC suggested by the psychologist who administered the test: "she can concentrate and persist in simple or moderately complex tasks during a normal workday." [Tr. 21]; [Tr. 604]. Given the minimal value of the third-party evidence, the ALJ's incorporation of a concentration limitation, and the reasons given by the ALJ to discredit Mayfield's allegations of concentration difficulties, remand is not necessary.

## C. Commissioner's Burden at Step 5

Mayfield argues that the Commissioner failed to uphold her burden at Step 5 of the evaluation process because the ALJ relied on testimony from the VE that was inconsistent with the Dictionary of Occupational Titles (DOT) and because the ALJ failed to acknowledge that the job base was reduced by 35-43 percent.

### 1. Inconsistencies Between the VE's Testimony and the DOT

At Step 5, the ALJ determined that Mayfield could perform work that exists in significant numbers in the national economy after a VE testified that a person with the same age, education, work experience, and RFC as Mayfield could perform jobs such as a kitchen helper, linen-room attendant, and order filler. [Tr. 30-31]. Mayfield argues that the VE testified inconsistently with the DOT, and therefore the ALJ's decision is not based on substantial evidence. In particular, Mayfield argues that the DOT identifies "making judgments and decisions" as a requirement of the linen-room attendant job, but that Mayfield's RFC limits her to making "good decisions during everyday situations and or stressors, but not consistently." Mayfield also points out that the VE testified that there was "not a lot of decision-making" in the jobs listed. [Tr. 46].

When a VE provides evidence that is inconsistent with information in the DOT, the ALJ must resolve and explain this conflict before relying on the VE's evidence to support a determination that a claimant is not disabled. SSR 00-4P, at *4. The job description for a linen-

18

room attendant states that a worker must be able to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and must "deal with problems involving several concrete variables in or from standardized situations." DICOT 222.387-030. The job lists judgment and decision making as a requirement. *Id.*

While the VE's testimony that there was "not a lot of decision-making going on in those jobs" is technically inconsistent with the DOT's description of a linen-room attendant, the VE's conclusion that Mayfield could perform work as a linen-room attendant is not inconsistent with the DOT's description. Mayfield's RFC does not state that she cannot ever make decisions or exercise judgment. It states that she can make good decisions, but not consistently. Nowhere in the DOT description does it require consistently good decision making.

Further, even if the VE's testimony regarding the requirements of a linen-room attendant is inconsistent with the DOT's definition, the ALJ's reliance on that testimony is harmless. Mayfield does not challenge the VE's conclusion that Mayfield could perform work as a kitchen helper or order filler, and so even if linen-room attendant was eliminated, Mayfield could still perform other jobs. Mayfield argues that the Court is not permitted to make this conclusion because the ALJ did not find the other two jobs, absent the job of linen-room attendant, existed in significant numbers. Rather, Mayfield argues that the ALJ only concluded that all three jobs, combined, existed in significant numbers and that the Court is not permitted to supply findings not made by the ALJ in her decision. In support of this argument, Mayfield cites to *McPheeters v. Astrue*, 2013 WL 523674 (W.D. Mo. 2013), where the court concluded that the VE's testimony was inconsistent with the DOT descriptions of two of the three jobs and that the ALJ failed to resolve the inconsistency in his opinion. The district court remanded the case so that the ALJ could provide an explanation of the inconsistency. Mayfield interprets the district court's

remand of this case to mean that the district court "declin[ed] to supply [a] finding that other jobs existed in significant numbers." [Doc. 15, p. 9]. But nowhere in the opinion does it state that this was an argument raised by the parties or that the court was prohibited from conducting this analysis. Likewise, this is not a case where the Commissioner is asking the Court to provide post-hoc reasoning that was not provided by the ALJ. Rather, it is an analysis of harmless error. *See Yelovich v. Colvin*, 532 Fed.Appx. 700, 702 (9th Cir. 2013) (stating that the parties agreed that two out of the three jobs listed by the ALJ were in error, but concluding that the ALJ's error was harmless because the one remaining job listed by the ALJ, which had 900 regional and 42,000 national jobs, constituted evidence of a significant number of jobs).

The two remaining jobs – kitchen helper and order filler – have a combined 10,300 positions in Missouri and 305,000 positions nationwide. Even reducing the job base by 43 percent, as Mayfield advocates for below, more than 5,800 jobs exist in Missouri and 173,850 jobs exist nationwide. Other courts, including the Eighth Circuit, have found fewer positions to be "significant numbers." *See Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997) (200 jobs in the state and 10,000 in the national economy was a significant number of jobs in the economy); *Yelovich*, 532 Fed.Appx. at 702 (900 regional and 42,000 national and collecting cases); *Lee v. Sullivan*, 988 F.3d 789, 794 (7th Cir. 1993) (1,400 positions and collecting cases from the Eighth, Ninth, Tenth, and Eleventh Circuits finding that 1,350 positions, 1,266 positions, 850-1,000 positions, 500 positions, 174 positions, and 675 positions were significant numbers). Therefore, even if the VE's testimony was inconsistent with the DOT's definition of a linen-room attendant, the remaining two jobs listed by the ALJ still constitute significant numbers, and therefore, the ALJ's failure to resolve the inconsistency – if one existed – was harmless.

## 2. Failure to Acknowledge a 35-43 Percent Reduction in the Job Base

Mayfield also contends that the Commissioner failed to sustain her burden at Step 5 because the ALJ did not completely reduce the job base as testified to by the VE. At her hearing, in response to a hypothetical that was ultimately not adopted by the ALJ, the VE stated that for the three jobs – linen-room attendant, kitchen helper, and order filler – the entire job base would be reduced by 23 percent "if you're avoiding people" or by 15 percent if there was "less than frequent people." [Tr. 45]. In response to a second hypothetical that was ultimately adopted by the ALJ, the VE testified that he "would additionally decrease the base by 20 percent based upon factors of variety and stress that are addressed by the DOT, which would impact on the ability to make good decisions." [Tr. 46-47]. Before concluding that significant numbers of jobs existed in the national economy that Mayfield could perform, the ALJ acknowledged the 20 percent reduction mentioned by the VE in the second hypothetical but not the 15-23 percent reduction mentioned in the first hypothetical. Mayfield argues that the two reductions should have been stacked and that the ALJ's failure to acknowledge this stacked reduction means that the ALJ failed to make appropriate findings that the jobs identified existed in significant numbers.

From the transcript, it is unclear whether the VE intended for the reductions to be stacked. The VE's testimony that he would "additionally decrease the base" suggests he did. Nonetheless, as discussed above in Part II.C.1, even when the linen-room attendant position is eliminated entirely and even when the total base is reduced by 43 percent (23 percent from the first hypothetical and 20 percent from the second hypothetical), a significant number of jobs exists. Therefore, any failure by the ALJ to stack the base reductions was harmless.

The Commissioner met her burden at Step 5 of the evaluation process. Additionally, the ALJ's conclusion that Mayfield did not have a medically determinable impairment of

Case 4:14-cv-00740-NKL   Document 16   Filed 06/01/15   Page 21 of 22

fibromyalgia and the ALJ's RFC determination were supported by substantial evidence in the record as a whole.  Therefore, the Commissioner's decision denying benefits is affirmed.

## III.    Conclusion

For the reasons set forth above, the Commissioner's decision is affirmed.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  June 1, 2015
Jefferson City, Missouri